UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSEPH MCCLASH, *et al.*,

        Plaintiffs,

v.                                                    Case No. 8:20-cv-543-AEP

FLORIDA DEPARTMENT OF
TRANSPORTATION, *et al.*,

        Defendants.

_____/

## ORDER

Plaintiffs Joseph McClash ("McClash"), Joe Kane ("Kane"), Linda Molto ("Molto"), and Jane von Hahmann ("von Hahmann") (collectively, "Plaintiffs") initiated this action seeking declaratory and injunctive relief relating to the proposed replacement of a drawbridge with a fixed-span bridge, at a height of 65 feet (the "65-foot High-Level Fixed-Bridge Alternative"), rather than another drawbridge, at a height of 35 feet, near the Village of Cortez, located in Manatee County, Florida (the "Cortez Bridge Replacement Project") (Doc. 1). Plaintiffs initially named several state and federal governmental entities and officials as defendants. Following dismissal of the federal governmental entities and officials, Plaintiffs now seek declaratory and injunctive relief only against Kevin J. Thibault, in his official capacity as Secretary of the Florida Department of Transportation, and the Florida Department of Transportation (collectively, "Defendants" or "FDOT"), pursuant to the Administrative Procedure Act ("APA") for a violation of the National

Environmental Policy Act ("NEPA") (Doc. 84).  Specifically, Plaintiffs challenge FDOT's decisions to (1) replace a 17-foot drawbridge with a 65-foot, fixed-span bridge; (2) forgo both an Environmental Impact Statement ("EIS") and Environmental Assessment ("EA") and proceed instead with a Categorical Exclusion ("CE") to NEPA; and (3) apply a CE that they contend is patently inapplicable to the proposed project (Doc. 84, ¶2).  In essence, Plaintiffs contend that FDOT violated NEPA by arbitrarily and capriciously relying on an inapplicable CE to exempt a "major Federal action" – *i.e.*, the construction of the 65-foot High-Level Fixed-Bridge Alternative – from FDOT's obligation to perform either an EIS or an EA.  Currently before the Court are the parties' cross-motions for summary judgment (Docs. 86, 92).  For the following reasons, Plaintiffs' Motion for Summary Judgment (Doc. 86) is denied, and Defendants' Motion for Summary Judgment (Doc. 92) is granted.

## I.    Background

Congress enacted NEPA to "encourage productive and enjoyable harmony between man and his environment" and "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man."  42 U.S.C. § 4321; *see* 40 C.F.R. § 1500.1(a) (indicating that NEPA "is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process").[1]  NEPA

---

[1]  FDOT's CE for the Cortez Bridge Replacement Project was approved on September 18, 2019 (AR 7-12).  Accordingly, all references to the regulations pertain to those in place at the time of the CE approval.  Further, all documents referenced in the Administrative

"is not a substantive environmental statute which dictates a particular outcome if certain consequences exist," but rather consists of a procedural statute that "creates 'a particular bureaucratic decisionmaking process.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214 (quoting *Sierra Club v. Marsh*, 872 F.2d 497 (1st Cir. 1989)); *see* 40 C.F.R. § 1500.1(a). NEPA does not mandate particular results, but merely prescribes the necessary process for assessing environmental effects and consequences of proposed agency actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Notably, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.*

To that end, NEPA establishes procedures for agencies to follow before taking any action, with the Council on Environmental Quality (the "CEQ") promulgating regulations to address environmental-impact issues and procedures. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008); *see* 40 C.F.R. § 1501.1 *et seq.* The CEQ's "NEPA regulations authorize the use of exclusions for those categories of actions 'which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations.'" *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp.

---

Record will be cited as: (AR [page number]); videos referenced in the Administrative Record will be cited as: (AR Doc. [number]).

2d 1116, 1138 (S.D. Fla. 2005) (quoting 40 C.F.R. § 1508.4).   Under the CEQ regulations, each federal agency is tasked with developing criteria for determining the appropriate level of environmental types of actions and establishing procedures and criteria for determining whether their proposed actions require an EIS or EA or whether such actions qualify as a CE, which, by their nature, do not require an EIS or EA.   *Fla. Keys Citizens Coal., Inc.*, 374 F. Supp. 2d at 1138; 40 C.F.R. § 1507.3(b)(2).   When deciding which class the anticipated action falls within, the agency must first determine whether the anticipated action constitutes a "major Federal action," which is an action that significantly affects the quality of the human environment.   *Van Antwerp*, 526 F.3d at 1360; 42 U.S.C. § 4332(C).   If the agency concludes that its proposed activity constitutes a major Federal action that will significantly affect the environment, the agency must discuss specific issues in an EIS; conversely, if the agency concludes that its proposed activity does not constitute a major Federal action that will significantly affect the environment, the agency must produce a finding of no significant impact ("FONSI"), which briefly presents the reasons why the action will not pose a significant effect on the human environment.   *Van Antwerp*, 526 F.3d at 1360 (citing 40 C.F.R. §§ 1508.13, 1508.18).

The Federal Highway Administration ("FHWA") regulations delineate three classes of actions that prescribe the level of documentation required in the NEPA process: an EIS (Class I), a CE (Class II), or an EA (Class III).   23 C.F.R. § 771.115(a)-(c).   Actions that significantly affect the environment require production of an EIS.   23 C.F.R. § 771.115(a).   On the other hand, a CE involves actions that

do not individually or cumulatively have a significant environmental effect and are therefore excluded from the requirement to prepare an EIS or EA.  23 C.F.R. § 771.101(b).  Any actions that do not involve EISs or CEs are EAs, which includes actions for which the FHWA has not clearly established the significance of the environmental impact.  23 C.F.R. § 771.115(c).

For FHWA actions, a list of CEs normally not requiring NEPA documentation is set forth in 23 C.F.R. § 771.117(c), but, when appropriately documented, additional projects may also qualify as CEs pursuant to 23 C.F.R. § 771.117(d).  FHWA specifically identified bridge rehabilitation, reconstruction, or replacement projects as categorically excluded from the class of actions for which an EIS or an EA is required, unless the project involves:

> (1) An acquisition of more than a minor amount of right-of-way [("ROW")] or that would result in any residential or non-residential displacements;
>
> (2) An action that needs a bridge permit from the U.S. Coast Guard [("USCG")], or an action that does not meet the terms and conditions of a U.S. Army Corps of Engineers nationwide or general permit under section 404 of the Clean Water Act and/or section 10 of the Rivers and Harbors act of 1899;
>
> (3) A finding of "adverse effect" to historic properties under the National Historic Preservation Act, the use of a resource protected under 23 U.S.C. 138 or 49 U.S.C. 303 (section 4(f)) except for actions resulting in de minimis impacts, or a finding of "may affect, likely to adversely affect" threatened or endangered species or critical habitat under the Endangered Species Act;
>
> (4) Construction of temporary access or the closure of existing road, bridge, or ramps that would result in major traffic disruptions;
>
> (5) Changes in access control;

> (6) A floodplain encroachment other than functionally dependent uses (e.g., bridges, wetlands) or actions that facilitate open space use (e.g., recreational trails, bicycle and pedestrian paths); or construction activities in, across or adjacent to a river component designated or proposed for inclusion in the National System of Wild and Scenic Rivers.

23 C.F.R. § 771.117(c)(28) & (e)(1)-(6).  As the Cortez Bridge Replacement Project required a bridge permit from the USCG (AR 10-11, 54-55, 6028-6050), FDOT could not proceed with a CE under 23 C.F.R. § 771.117(c)(28).  Instead, FDOT contends that the 65-foot High-Level Fixed-Bridge Alternative qualified for a CE under 23 C.F.R. § 771.117(a) and (d) as FDOT appropriately analyzed and documented findings demonstrating that the project would not have any significant impact to the natural or human environment.

Under Florida law, FDOT maintains "responsibility for coordinating the planning of a safe, viable, and balanced state transportation system serving all regions of the state."  Fla. Stat. § 334.044(1).  In carrying out its responsibilities for coordinating the planning of a safe, viable, and balanced state transportation system, FDOT oversees the operation of State Road ("SR") 684, or Cortez Road (*see* AR 124).  Importantly, SR 684 spans the Gulf Intracoastal Waterway across the Cortez Bridge; is an east-west "Urban Principal Arterial (Other)" road that provides one of three vehicular access routes to Anna Maria Island; and has been designated as an evacuation route by the Florida Division of Emergency Management, State Emergency Response Team (AR 124).

As Plaintiffs recognize, after entering into a Memorandum of Understanding ("MOU") with the United States Department of Transportation ("USDOT") and

6

FHWA on December 14, 2016, FDOT additionally assumed responsibility for compliance with the requirements of NEPA (AR 607-28). *See* 23 U.S.C. § 327(a)(2)(A); 23 C.F.R. § 771.117(g); *see* Fla. Stat. § 334.044. Pursuant to 23 U.S.C. § 327 and the MOU, FDOT therefore assumed USDOT and FHWA responsibilities under NEPA to conduct environmental review and consultation for certain highway projects in Florida, including the Cortez Bridge Replacement Project, and is deemed to be acting as FHWA (AR 607-28). Plaintiffs claim that FDOT failed to properly carry out its responsibilities under NEPA.

Put simply, Plaintiffs challenge the action taken by FDOT related to the proposed replacement of the Cortez Bridge and its approaches located on State Road 684 between SR 789, or Gulf Drive, and 123rd Street West in Manatee County, Florida. The action Plaintiffs seek to challenge is FDOT's issuance of a Location Design Concept Approval ("LDCA") to replace the existing low-level drawbridge with the 65-foot High-Level Fixed-Bridge Alternative in the Cortez Bridge Replacement Project (AR 7-606, 3516-17, 3519, 3524-25). Plaintiffs contend that the Cortez Bridge Replacement Project does not qualify for a CE, but FDOT disputes that contention. As FDOT contends that the Cortez Bridge Replacement Project satisfies the criteria for a CE under both 23 C.F.R. § 771.117(a) and (d), FDOT conducted neither an EIS nor an EA for the Cortez Bridge Replacement Project (*see* AR 8-12, 638).

Under 23 C.F.R. § 771.117(a):

CEs are actions that meet the definition contained in 40 CFR 1508.4, and, based on FHWA's past experience with similar actions, do not

involve significant environmental impacts.  They are actions that: Do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

Additionally, other actions that meet the criteria for a CE in the CEQ regulations and paragraph (a) of the regulation may be designated as CEs only after FHWA approval unless otherwise authorized under an executed agreement pursuant to paragraph (g) of the regulation, which provides that FHWA may enter into programmatic agreements with a State to allow a State DOT, such as FDOT, to make a NEPA CE certification or determination and approval on FHWA's behalf, for CEs specifically listed in paragraphs (c) and (d) of the regulation and that meet the criteria for a CE under 40 C.F.R. § 1508.4, and are identified in the programmatic agreement.  23 C.F.R. § 771.117(d) & (g).  To proceed with a CE under 23 C.F.R. § 771.117(d), the applicant must submit documentation demonstrating that the specific conditions or criteria for the CEs are satisfied and that significant environmental effects will not result.

FDOT's CE was approved on September 18, 2019 (AR 12).  In determining that the Cortez Bridge Replacement Project qualified for a CE, FDOT concluded that no significant impacts would affect any social, economic, cultural, natural, or physical resources (AR 9-10).  In fact, based on extensive review and cooperation with the USCG, Southwest Florida Water Management District ("SWFWMD"), and the U.S. Environmental Protection Agency ("EPA"), FDOT found that the 65-

foot High-Level Fixed-Bridge Alternative would provide enhancements in mobility, water quality and quantity, navigation, and for bicycles and pedestrians (AR 9-10). As FDOT explains, regardless of the chosen alternative, functional and structural deficiencies necessitated the Cortez Bridge Replacement Project, and, after extensive review and consideration, including an engineering analysis, environmental studies, and inter-agency coordination, the 65-foot High-Level Fixed-Bridge Alternative presented the preferred alternative (AR 7-606, 629-37).

Notably, the existing Cortez Bridge was constructed in 1956 to replace the original 1921 wooden bridge connecting Anna Maria Island with the mainland in Manatee County (AR 124). As constructed, the existing Cortez Bridge consists of an undivided, two-lane, low-level bascule (drawbridge) structure (AR 124). The results from several bridge inspection reports conducted since 2008 show that the Cortez Bridge has become functionally obsolete and structurally deficient (AR 126, 3630-3632, 3645-3646, 3698-3699, 3759-3761, 3777-3778, 3813-3815, 3831-3832, 4032-4033, 4167-4168, 4365-4366). In fact, as early as 2008, the bridge sufficiency rating identified for the Cortez Bridge was a 21.7, out of a maximum 100.0 rating (AR 126, 3631, 3645-3646). A bridge receiving a sufficiency rating of 80.0 or lower is eligible for federal rehabilitation funding, while a rating of 50.0 or lower provides justification for replacement (AR 126). With respect to the Cortez Bridge, FDOT anticipated that it would deteriorate further as the structure continues to move beyond its service life of 50 years, which it reached in 2006 (AR 126).

In considering alternatives for improving the condition of the Cortez Bridge, FDOT conducted a Project Development and Environment ("PD&E") Study for roadway and bridge improvement alternatives along SR 684 from SR 789 to 123rd Street West in Manatee County, Florida (AR 18, 117-320, 3516-17, 3519, 3524-25). As indicated, the project location and PD&E Study encompassed an approximate distance of 0.9 miles of the portion of SR 684 between SR 789 within the City of Bradenton Beach on Anna Maria Island to 123rd Street West within the Village of Cortez (AR 18-19, 124). The defined purpose for the PD&E study was to address the structural and functional deficiencies of the existing Cortez Bridge, with the need for the project based upon the several deficiencies identified throughout the bridge inspection reports from 2008 through 2017 (AR 25, 3630-4454).

At a Public Hearing held on August 31, 2017, FDOT presented three alternatives to address the noted deficiencies with the Cortez Bridge, namely: (1) the No-Build (Repair) Alternative; (2) the 35-foot Mid-Level Drawbridge Alternative; and (3) the 65-foot High-Level Fixed-Bridge Alternative (AR 18, 180, 3526-53; AR Doc. 09). Though FDOT at first considered a Rehabilitation Alternative of the existing Cortez Bridge, FDOT eliminated that alternative from further consideration in the PD&E Study (AR 175-79, 201-02).[2] In fact, following the Public Hearing and comment period, and after considering the advantages and disadvantages of each, FDOT decided against further consideration of the No-Build

---

[2]  A 45-Foot, Mid-Level Drawbridge Alternative and a 21-Foot, Low-Level Drawbridge Alternative were also considered but eliminated from further consideration in the PD&E Study (*see* AR 204).

(Repair) Alternative and the Rehabilitation Alternative because those alternatives did not meet the purpose and need of the PD&E Study to address the functional and structural deficiencies of the Cortez Bridge (AR 18, 170-74, 175-79, 201-22).

Moreover, both the No-Build (Repair) Alternative and the Rehabilitation Alternative presented more disadvantages than replacement of the Cortez Bridge. For example, the No-Build (Repair) Alternative would require a nine-week bridge closure and detour of traffic; would have a short service life (10 years), with replacement of the bridge required thereafter; the bridge would remain functionally obsolete for the life of the structure; continued and increasing operation, maintenance, and repair costs would accrue; continued safety concerns would remain regarding brush curbs, lack of adequate shoulders, substandard traffic railings, and vessels impacting the piles since the piles were not designed for ship impact; continued concern for effective and reliable emergency evacuation and recovery due to mechanical system malfunction or disabled vehicles would occur; no improvement in water quality would happen; delays caused by drawbridge openings and as vessels wait for the bridge to open would continue; and vulnerability to the bridge due to wave action in severe storms would remain (AR 170-74, 201). Similarly, the potential disadvantages of the Rehabilitation Alternative included a relatively short service life (25 years) before replacement would be needed; the bridge would remain functionally obsolete for the life of the structure; continued and increasing operation, maintenance, and repair costs; continued safety concerns regarding the lack of adequate shoulders and vessels

impacting the piles; continued concern for effective and reliable emergency evacuation and recovery due to mechanical system malfunction or disabled vehicles; no improvement in the water quality; vehicular and vessel delays due to the opening of the drawbridge; no aesthetic improvements; and the requirement to build a temporary bridge, at a cost of $15 million, which would impact the land and marine environment (AR 175-79, 201-02).

FDOT also analyzed the advantages and disadvantages of the 35-foot Mid-Level Drawbridge Alternative and the 65-foot High-Level Fixed-Bridge Alternative (18-20, 204-17). FDOT deemed the 65-foot High-Level Fixed-Bridge Alternative the "Preferred Alternative" instead of the 35-foot, Mid-Level Drawbridge Alternative for several reasons, including:

- Vehicles and boats will have improved traffic flow with a 65-foot High-Level Fixed-Bridge Alternative, which will eliminate congestion and delays caused by the existing drawbridge openings.
- The initial capital cost to construct a 65-foot High-Level Fixed-Bridge Alternative is approximately $23.8 million less than the 35-foot Mid-Level Drawbridge Alternative.
- The Life Cycle Cost Analysis demonstrated that bridge replacement is a better financial investment compared to bridge repair, and the 65-foot High-Level Fixed-Bridge Alternative is a better investment than the more costly 35-foot Mid-Level Drawbridge Alternative over the life of the bridge in terms of Net Present Value and Equivalent Annual Cost.
- The 65-foot High-Level Fixed-Bridge Alternative will have improved operational reliability compared to the 35-foot Mid-Level Drawbridge Alternative, especially in emergency situations and evacuation events, since there are no mechanical moving parts and electrical systems to malfunction, which could potentially close the bridge to traffic altogether. In addition, there is no chance of human error during the operation of a drawbridge.

- Comments received at the August 31, 2017 Public Hearing, where all costs and impacts were presented, indicated that of the responses that favored replacement, 75% favored the 65-foot High-Level Fixed-Bridge Alternative and 24% favored the 35-foot Mid-Level Drawbridge Alternative. …
- The 65-foot High-Level Fixed-Bridge Alternative provides opportunities for greater community cohesion and walkability with a roadway, sidewalks, and public space under the new bridge at 127th Street West. The 65-foot High-Level Fixed-Bridge Alternative is high enough to create an open space along the waterfront under the Cortez approach and bridge.  This could support a variety of public uses and amenities that can be implemented at the discretion of the local agencies.  This new public space and grade separated access means that vehicles and pedestrians would not have to cross SR 684 (Cortez Road) at grade, resulting in improved safety.  These opportunities are not possible with the 35-foot Mid-Level Drawbridge Alternative.

(AR 18-20).  In reaching that conclusion, FDOT considered and evaluated the potential impacts of the 65-foot High-Level Fixed-Bridge Alternative to the environment and determined that it was categorically excluded from the requirement to prepare an EIS or EA under NEPA because no significant environmental impacts existed (AR 8-12, 638).  In doing so, FDOT analyzed the potential impacts of the 65-foot High-Level Fixed-Bridge Alternative using the criteria set forth in 23 C.F.R. § 771.117(a), determining that it would have no significant impact on economic resources, would prove compatible with current and future land use plans, would enhance the overall movement and circulation of people within and between the mainland and Bradenton Beach for businesses and residents, would assist with facilitating emergency evacuations, would have no significant impacts aesthetically, would not displace any residences or businesses within the community, mitigation and minimization measures would allow for no

significant impact on potential noise-sensitive sites, would have no significant impact on air quality or contamination, would enhance bicycle and pedestrian facilities, would enhance navigation, and would otherwise have no significant impacts on historical, cultural, natural, recreational, or other resources (AR 9-12, 32-55, 223-53).

Given its findings, FDOT determined that a CE applied under 23 C.F.R. § 771.117, as the 65-foot High-Level Fixed-Bridge Alternative would not cause any significant impact to the natural or human environment, as documented throughout the Administrative Record, and thus that it did not need to issue an EIS or EA under NEPA. Accordingly, FDOT issued the LDCA, advancing the 65-foot High-Level Fixed-Bridge Alternative to replace the existing Cortez Bridge (Tr. 3516-17, 3519, 3524-25). Subsequently, on October 18, 2019, FWHA, on behalf of FDOT, issued its notice of final agency action regarding the Cortez Bridge Replacement Project and provided guidance on how to seek judicial review of the agency action, noting that all claims would be barred unless filed on or before March 23, 2020 (AR 3524-25).

Following issuance of the LDCA and notice of final agency action, Plaintiffs timely initiated this action on March 9, 2020, requesting declaratory and injunctive relief against FDOT (Docs. 1, 73, 84). Primarily, Plaintiffs asked that the Court declare that: (1) FDOT is subject to NEPA and the APA pursuant to the MOU with the FWHA; (2) the MOU does not include FDOT assumption from the FHWA for those design matters and determination when a significant encroachment on a

floodplain is the only practicable alternative; (3) FDOT violated and continues to violate NEPA and the APA; (4) the FDOT's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with NEPA and violates the APA; (5) application of the CEs described in 23 C.F.R. § 711.117(a) & (d) violates NEPA and the APA; and (6) the LDCA by the FDOT does not meet the requirements for a Type 2 CE Determination (Doc. 84, at 22). Further, Plaintiffs request injunctive relief in the form of (1) setting aside FDOT's decision and entering an order vacating the CE Determination and approval of the LDCA; (2) requiring FDOT to conduct further environmental review for a project under NEPA, *i.e.*, an EIS or an EA, and the APA; and (3) enjoining any action resulting from approval of the LDCA for the 65-foot High-Level Fixed-Bridge Alternative by FDOT until an EIS or EA has been carried out in accordance with NEPA and requiring Defendants to look at all the alternatives in the EIS (Doc. 84, at 22-23).

The parties now submit their cross-motions for summary judgment. In their motion, Plaintiffs reassert that FDOT violated NEPA by arbitrarily and capriciously relying on the inapplicable CE to exempt "major Federal action," *i.e.,* the construction of the 65-foot High-Level Fixed-Bridge Alternative, from FDOT's obligation to perform either the EIS or EA (Doc. 86). Specifically, Plaintiffs contend that FDOT failed to perform a location hydraulic study regarding floodplain impacts, failed to demonstrate past experience with similar actions, failed to demonstrate that the 65-foot High-Level Fixed-Bridge Alternative does not have a significant impact on cultural and historic resources, and failed to demonstrate

that the 65-foot High-Level Fixed-Bridge Alternative does not have a significant impact on noise levels.  Given such failures, Plaintiffs argue that FDOT failed to satisfy the heightened requirements of 23 C.F.R. § 771.117(a) and (d) for a CE relieving FDOT from the obligation under NEPA to conduct a thorough EIS and EA.

Defendants counter by setting forth several arguments in support of granting summary judgment in their favor (Doc. 92).  First, they argue that Plaintiffs failed to establish standing for their claim that FDOT violated NEPA, as Plaintiffs rely solely on allegations of standing rather than proof of standing.  Beyond the issue of standing, Defendants argue that FDOT appropriately analyzed the proposed bridge for floodplain encroachments and satisfied its burden because the drainage design will be consistent with Federal Emergency Management Agency ("FEMA"), FDOT, and SWFWMD design guidelines.  As the proposed bridge will employ drainage systems that will perform hydraulically in a manner equal to or greater than the existing drainage systems, meaning there will be no significant floodplain encroachment, FDOT contends that it was not required to perform an "only practicable alternative" analysis under 23 C.F.R. § 650.11.  Next, Defendants argue that the proposed bridge will have no significant impacts to cultural or historic resources or alter the characteristics in the Cortez Historic District within the Village of Cortez on the east end of the project area because the proposed bridge will not require any ROW acquisition form the historic district, will not require any changes to the existing roadway adjacent to the historic district, and will not be readily

visible from the historic district.  Even if some public survey responses favor a different result, Defendants contend that no "heckler's veto" exists under NEPA such that the responses would render the proposed bridge "highly controversial" or require further study under an EIS or an EA.  Similarly, Defendants contend that no eligible cultural or historic resources fall within the City of Bradenton Beach on the west end of the project, so no significant impacts to cultural or historical resources within the City of Bradenton Beach will result from the proposed bridge.

Going further, Defendants argue that no significant impacts to community aesthetics will occur because FDOT dedicated a portion of the construction budget to landscaping and is committed to establishing and working closely with a bridge design committee for the design phase of the project to allow local community members to advise FDOT on aesthetic design features for the proposed bridge and its approaches.  According to Defendants, the proposed bridge will also provide opportunities to enhance the community cohesion of the Village of Cortez by connecting the north and south sides of the community with a roadway, sidewalks, and walkable public space along the waterfront under the new bridge at 127th Street West.  Regarding mobility and facilities for bicyclists and pedestrians, Defendants assert that the proposed bridge will provide improved facilities with the addition of 10-foot sidewalks and 10-foot shoulders across the bridge instead of the 5- to 6-foot sidewalks on the existing bridge; the sidewalks will meet the requirements under the Americans with Disabilities Act ("ADA") for access, width, and grade; and, by removing delay caused by the opening of the drawbridge, the proposed bridge will

improve mobility between Anna Maria Island and the mainland by reducing vehicular travel times and enhance navigation for vessels using the Gulf Intracoastal Waterway.   As to noise, Defendants state that FDOT conducted a thorough evaluation of noise-sensitive sites in the relevant project area and concluded that none of the sites will experience a substantial increase of traffic noise due to the proposed bridge over existing conditions and that FDOT is committed to further consideration of noise abatement measures during the design phase, including receiving community input.   Regarding stormwater treatment, Defendants indicate that the existing bridge does not contain any, while the proposed bridge will add curb, gutter, and pipes to convey stormwater runoff to treatment ponds and will comply with all design requirements of authorized regulatory agencies to address water quality and quantity issues.

From a procedural standpoint, Defendants argue that there is no requirement in 23 C.F.R. § 771.117 that FDOT include in the Administrative Record documentation of "past experience" with bridge replacement projects to show that the proposed bridge will not have significant environmental impacts.   Rather, Defendants contend that FWHA performed such "past experience" analysis when promulgating the categorical exclusions found in 23 C.F.R. § 771.117 through rulemaking, and FDOT is not seeking to create a new categorical exclusion but instead to show that the proposed bridge qualifies under FHWA's existing categorical exclusions in 23 C.F.R. § 771.1117.   Defendants further assert that Plaintiffs failed to state a plausible claim for relief as to the allegation that, by using

U.S. census block data, FDOT failed to define low-income and senior population within the area of impact for the proposed bridge.  Finally, Defendants believe that FDOT satisfied its burden of demonstrating that the proposed bridge qualifies for a CE under 23 C.F.R. § 771.117(a) and (d) by thoroughly evaluating and documenting project-related impacts in reaching its determination that no significant environmental impacts would occur based upon the criteria set forth in 23 C.F.R. § 771.117.

In response, Plaintiffs assert that they maintain standing to bring their claims (Doc. 96).  In support of their standing assertion, they provide affidavits setting forth each Plaintiff's basis for standing (Doc. 96, Ex. 1-4).  Additionally, Plaintiffs provide a supplement of a recent Eleventh Circuit decision, *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235 (11th Cir. 2022), addressing what suffices as an "injury in fact" for purposes of standing in cases involving environmental issues (Doc. 100).

## II.    Standard of Review

Typically, in considering motions for summary judgment, courts apply the standard set forth in Rule 56, Federal Rules of Civil Procedure.  Under that standard, summary judgment is appropriate where the movant demonstrates that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  "Because NEPA does not provide for a private right of action, plaintiffs

challenging an agency action based on NEPA must do so under the [APA]." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) (internal quotation marks and citations omitted).  When a party seeks review of agency action under the APA, the Rule 56 standard does not apply, since the district judge sits as an appellate tribunal considering the entire case on review as a question of law. *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1349 (M.D. Fla. 2016).  Instead, summary judgment provides the mechanism by which the court decides whether, as a matter of law, "the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Id.* at 1350 (citation and internal quotation marks omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  Pertinent to this case, the APA provides for judicial review of agency decisions under the NEPA, including review of an agency's finding of "no significant impact," decision not to prepare an EIS, and determination whether a CE was proper.  *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1288 (11th Cir. 2015); *see Van Antwerp*, 526 F.3d at 1359-60; *Fla. Keys Citizens Coal., Inc.*, 374 F. Supp. 2d at 1139.  Under the APA, a reviewing court must decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency decision and, importantly, hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with applicable law.  5 U.S.C. § 706(2)(A); *see Van Antwerp*, 526 F.3d at 1361 ("A court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion in violation of the APA.").  Under the "arbitrary and capricious" standard, the scope of review by a court is extremely deferential and narrow, such that the court may not substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Van Antwerp*, 526 F.3d at 1360 ("Moreover, an agency's NEPA decisions are only reviewed under the APA's highly deferential standard).  The substantial deference to the agency occurs "not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Van Antwerp*, 526 F.3d at 1361.

Notwithstanding, the agency needs to show that it examined the relevant data and articulated a satisfactory explanation for its chosen action, including a rational connection between the facts found and the agency decision made.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (citation omitted).  Upon review of the agency's explanation, the court must determine whether the agency based the decision on a consideration of the relevant factors and whether a clear error of judgment occurred.  *Id.*  Typically, a court would find an agency rule arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* A reviewing court therefore should not attempt to correct such deficiencies, since the court may not provide a reasoned basis for the agency's action that the agency itself failed to provide. *Id.* A court will, however, uphold a decision of "less than ideal clarity" if the court may reasonably discern the agency's path to such decision. *Id.* (internal quotation marks and citation omitted). In the end, agency findings must be supported by substantial evidence on the administrative record considered as a whole. *Id.* at 43-44. If a court finds deficiencies in the agency's reasoning, the court may not rectify such reasoning or provide a reasoned basis for the agency's decision which the agency did not articulate but must remand to the agency so that the agency may reconsider its own findings. *Sierra Club*, 295 F.3d at 1216.

### III. Discussion

#### A. Standing

FDOT argues that Plaintiffs fail to establish standing to bring their claims in this action. According to FDOT, Plaintiffs' mere allegations that they maintain standing do not, at the summary-judgment stage, suffice. Rather, FDOT contends that Plaintiffs must provide adequate evidence to establish both standing under Article III of the United States Constitution ("constitutional standing") and the judicially created doctrine of prudential standing, yet they have failed to do so. Plaintiffs dispute such contention and provide affidavits to support their position

that they maintain both constitutional and prudential standing to bring a claim in this action.  Resolving the issue of standing accordingly requires analysis of both constitutional and prudential standing.  *See Ouachita Watch League*, 463 F.3d at 1170. Notably, "[s]o long as one party has standing, other parties may remain in the suit without a standing injury."  *Id.*

### i.      Constitutional Standing

Plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing the elements for constitutional standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  To establish constitutional standing, a plaintiff must demonstrate that (1) the plaintiff suffered an "injury in fact," meaning "an invasion of a legal protected interest which is (a) concrete and particularized, … and (b) actual or imminent, not conjectural or hypothetical[;]" (2) a causal connection exists between the injury and the conduct complained of, meaning that the injury must be fairly traceable to the challenged action of the defendant instead of the result of independent action of some third party not before the court; and (3) it must be likely, rather than merely speculative, that the plaintiff's injury will be redressed by a favorable decision by the court.  *Id.* at 560-61 (internal quotation marks and alterations omitted; citations omitted); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan*,

504 U.S. at 561 (citations omitted).  At the summary judgment stage, a plaintiff can no longer rest on "mere allegations" but needs to set forth specific facts by affidavit or other evidence, which, for purposes of a summary judgment motion, will be taken as true.  *Id.*  In considering a factual challenge to standing in a motion for summary judgment, the court looks beyond the complaint to the depositions, answers to interrogatories, and admissions on file, together with the affidavits.  *Am. C.L. Union of Fla. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1247 (11th Cir. 2012).

### a.     Injury In Fact

To establish an injury in fact, the plaintiff's injury must be particularized, meaning it affects the plaintiff in a personal and individual way, and must be concrete, meaning "it must actually exist."  *Spokeo*, 578 U.S. at 339-40.  In this context, "concrete" is not necessarily synonymous with "tangible," since intangible injuries may prove sufficiently concrete.  *Id.* at 340.  Regarding environmental plaintiffs, the Supreme Court has held that such plaintiffs "adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  As the Supreme Court has recognized, "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society."  *Morton*, 405 U.S. at 734.

Though only one plaintiff must show he or she maintains standing to bring a claim, Plaintiffs here demonstrate that each could suffer particularized and concrete harm stemming from FDOT's final decision regarding the Cortez Bridge Replacement Project.   Namely, in their reply, Plaintiffs provide affidavits addressing the specific injuries each individual contends he or she will suffer stemming from FDOT's decision to proceed with the 65-foot High-Level Fixed-Bridge Alternative.  For example, McClash asserts that he is a resident of Manatee County and owns property near the bridge within the same floodplain (Doc. 96-1, Affidavit of Joseph McClash ("McClash Aff."), ¶¶2-5).[3]  According to McClash, the project affects his substantial interest in the use of the navigable waters at the Cortez Bridge for sailing, which he has enjoyed using for more than 30 years and plans to continue to use in the future, including use of his sailboat, which has a mast height of more than 60 feet, and other boats with mast heights of more than 65 feet (McClash Aff., ¶3).  McClash asserts that the project creates harm to the human environment in the same areas he enjoys at the existing Cortez drawbridge and surrounding waterways and, notably, that he vocalized his concerns to FDOT about the proposed project (McClash Aff., ¶¶2, 3, 6).  Further, McClash indicates that he worked as a Manatee County Commissioner for years, including a role in achieving a prior compromise in the 1990s with FDOT and the Mayor of the City of

---

[3]  The McClash Affidavit is misnumbered, such that there are two paragraphs designated as number three.  Accordingly, reference to each paragraph number will be to the correct numerical number rather than the number identified next to each paragraph in the McClash Affidavit.

Bradenton Beach that led to the Cortez Bridge remaining a drawbridge to avoid future challenges (McClash Aff., ¶7).

Kane states that he has been a resident of a tiny commercial fishing sub-village called "Fewville" in the Village of Cortez for more than 20 years (Doc. 96-2, Affidavit of Joe Kane ("Kane Aff."), ¶2). According to Kane, he is a senior citizen and a low-income resident with physical limitations (Kane Aff., ¶3). Kane asserts that the 65-foot High-Level Fixed-Bridge Alternative contemplated in FDOT's final agency action will adversely impact his mobility, destroy his ability to use the current walkway along the existing drawbridge to travel to and access Bradenton Beach without an automobile, and adversely affect the quality of life he currently enjoys and intends to enjoy in the future (Kane Aff., ¶3). Kane contends that the 35-foot drawbridge alternative would not create such adverse impacts to his life and constitutes a plausible, practicable, and viable alternative that, if built, would reduce impacts to the human environment of the Village of Cortez as a historic commercial fishing village (Kane Aff., ¶4).

Molto, a 32-year resident of the Village of Cortez in one of the oldest houses in the village, also asserts that the 65-foot High-Level Fixed-Bridge Alternative will immediately affect her substantial interests (Doc. 96-3, Affidavit of Linda Molto ("Molto Aff."), ¶¶2, 3). Primarily, Molto asserts that the 65-foot High-Level Fixed-Bridge Alternative will adversely impact her quality of life by impacting her ability to access her property, located directly at the base of the bridge, creating a dangerous intersection of offsetting streets without a safe pedestrian crossing, and creating

undesirable visual and aesthetic changes and intolerable noise that could be avoided with construction of a 35-foot drawbridge (Molto Aff., ¶4).  According to Molto, the proposed bridge will create a divide in her neighborhood and the Village of Cortez with a wall-like structure, thereby splitting the community, and placing a ramp between the symbiotic community of local businesses and residential housing for the commercial fishing industry (Molto Aff., ¶5).  Moreover, Molto asserts that the proposed bridge increases the incline and distance of the bridge, which impacts her mobility in walking to Bradenton Beach as a pedestrian across the existing bridge, and changes the aesthetics of the Village of Cortez in contravention of Manatee County's land-use restrictions, which were intended to preserve and protect the historic fishing village from encroachments that would adversely affect the community character (Molto Aff., ¶5).  Like McClash, Molto states that she previously made comments and attended hearings regarding the Cortez Bridge Replacement Project (Molto Aff., ¶3).

Finally, von Hahmann asserts that she owns commercial and residential rental property and operates family businesses in the Village of Cortez, where she has also resided for 46 years, and that those properties and businesses are all located within the same floodplain as the bridge ramp approaches and near the projected bridge ramps and structures necessary to build the 65-foot High-Level Fixed-Bridge Alternative (Doc. 96-4, Affidavit of Jane von Hahmann ("von Hahmann Aff.", ¶¶2-4).  According to von Hahmann, her family businesses serve members of the Village of Cortez community and are more easily accessible to persons traveling over the

current drawbridge, which is generally at grade and does not have a large ramp approach with a steep incline (von Hahmann Aff., ¶3). She states that the creation of a large, steep ramp for the proposed bridge will adversely affect her family businesses and her personal quality of life and will also produce an unsafe environment for herself and other pedestrians given the speed that automobiles will reach coming off the incline of the 65-foot High-Level Fixed-Bridge Alternative (von Hahmann Aff., ¶3). Additionally, she contends that the need to add a frontage road will divide the village in half and force those living on the north side to travel west to the water to safely cross to the south side of the village, where most of the eateries and stores are located, including her family businesses (von Hahmann Aff., ¶3). Given that the age of many of the residents in the village exceeds 75 years, von Hahmann believes such travel will be an excessive, unnecessary burden on those individuals, especially since the drawbridge alternative would not require a major roadway change (von Hahmann Aff., ¶3). She asserts that the impacts of the FDOT's decision fall within the zone of interest of the human environment and impacts her quality of life, her environment, her family's businesses, her financial well-being, and the preservation of the intact, historic Village of Cortez that she currently enjoys and intends to enjoy in the future (von Hahmann Aff., ¶6). Along with McClash and Molto, von Hahmann made comments and attended hearings relating to the project (von Hahmann Aff., ¶2). Like McClash, she served as a Manatee County Commissioner for several years, representing the interests of the Village of Cortez as well as the citizens of Manatee County, and participated both

as a citizen and former elected official commenting on bridge options (von Hahmann Aff., ¶7). She believes that the alternative, 35-foot drawbridge would reduce impacts to the human environment and continue to preserve a piece of Florida history and her enjoyment of living and working in the historic commercial fishing Village of Cortez (von Hahmann Aff., ¶7).

Based on the foregoing, Plaintiffs each established injury in fact. The harm is both particularized, in that it affects Plaintiffs in a personal and individual way, and concrete, in that it actually exists. Accordingly, Plaintiffs demonstrated the first element of constitutional standing.

### b.    Causation

Once a plaintiff establishes injury in fact under NEPA, "the causation and redressability requirements are generally more relaxed." *Ouachita Watch League*, 463 F.3d at 1172. To establish causation for a claim brought under NEPA, a plaintiff "must demonstrate only that it is reasonably probable that the challenged actions will threaten its concrete interests." *Id.* In this context, the "proper focus on causation is not harm to the environment, but harm to the plaintiffs." *Id.* Here, Plaintiffs contend that they suffered harm when their procedural rights under NEPA were violated by FDOT's failure to comply with NEPA. *See id.* at 1173. Since, according to Plaintiffs, FDOT failed to comply with NEPA, FDOT caused Plaintiffs' alleged injury. *See id.* Additionally, Plaintiffs argue that the proposed High-Level Fixed-Bridge Alternative will negatively impact their human

environment, as discussed above.   Plaintiffs therefore met their burden of establishing causation for purposes of constitutional standing.  *See id.*

### c.    Redressability

The final element a court must consider in determining whether a plaintiff has established constitutional standing is redressability.   As in *Ouachita Watch League*, the court, if it concludes that FDOT failed to follow NEPA, has the power to order the agency to comply.  *Id.*  As the injury Plaintiffs assert is FDOT's failure to comply with NEPA, "that injury is plainly redressable."  *Id.*  Plaintiffs thus satisfied the elements of constitutional standing.  *See id.*

### ii.    Prudential Standing

Likewise, Plaintiffs established prudential standing.  The primary purpose of prudential standing is to ensure that the plaintiff constitutes the type of plaintiff for which the contested statute or constitutional right envisions protection.  *RB Jai Alai, LLC v. Sec. of Fla. Dep't of Transp.*, 47 F. Supp. 3d 1353, 1361-62 (M.D. Fla. 2014). The relevant inquiry for prudential standing thus asks the question "whether a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit."  *Ouachita Watch League*, 463 F.3d at 1173 (internal quotation marks and citation omitted); *see, generally, Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (indicating that the question of standing concerns "the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.").  For purposes of prudential standing under

the APA, a plaintiff must demonstrate that a final agency action adversely affecting it has occurred and that, as a result of such agency action, the plaintiff suffers a legal wrong or that its injury falls within the "zone of interests" of the statutory provision that the plaintiff claims the agency violated. *Ouachita Watch League*, 463 F.3d at 1173 (internal quotation marks omitted). Depending on the circumstances, the protected interests may reflect aesthetic, conservational, recreational, and economic values. *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 154.

First, a final agency action involves "one that is the agency's definitive position, affects the parties' legal rights or obligations, and immediately impacts the regulated parties' daily operations." *RB Jai Alai*, 47 F. Supp. 3d at 1365. As the Eleventh Circuit explained in *Ouachita Watch League*, it is "well settled" that an agency's final EIS or the record of decision issued thereon constitutes final agency action for purposes of a NEPA claim. *Ouachita Watch League*, 463 F.3d at 1173. Here, Plaintiffs challenge FDOT's failure to create an EIS or EA and the record upon which FDOT made that decision, as the decision constitutes a final agency action under NEPA.

Second, as indicated above, Congress's primary purposes in enacting NEPA include encouraging harmony between man and the environment and promoting efforts to prevent or eliminate damage to the environment. 42 U.S.C. § 4321; *see* 40 C.F.R. § 1500.1(a). Going further, Congress declared its national environmental policy under NEPA to use all practicable means to achieve the following:

> (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b)(1)-(6). In doing so, Congress recognized "that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." 42 U.S.C. § 4331(c).

In this instance, Plaintiffs contend that FDOT's failure to comply with NEPA as applied to the Cortez Bridge Replacement Project will adversely affect the environment and, additionally, their use and enjoyment of the environment, including recreational, aesthetic, and cultural effects and impacts the proposed bridge will have on them and their community, which is the source of their injuries. The injuries Plaintiffs assert that they will suffer because of FDOT's final agency action fall squarely within the "zone of interests" protected by NEPA. *See Ouachita Watch League*, 463 F.3d at 1173. Accordingly, Plaintiffs established both

constitutional and prudential standing to proceed with their claims as proper plaintiffs in this action.  *See id.*

## B.    CE

Having established that Plaintiffs maintain standing to bring a NEPA claim, the analysis turns to whether they can prevail on such claim.  As noted, Plaintiffs set forth a single claim in their Second Amended Complaint, alleging that, if FDOT proceeds with the 65-foot High-Level Fixed-Bridge Alternative, it may not claim a CE under 23 C.F.R. § 771.117 but rather must prepare an EIS or EA to comply with NEPA.  Specifically, Plaintiffs contend that FDOT failed to satisfy the requirements for a CE under 23 C.F.R. § 771.117(a), (c)(28), and (d).   In their Motion for Summary Judgment, Plaintiffs focus upon a few noted deficiencies in FDOT's analysis and decision-making process, which they contend preclude application of a CE.  Plaintiffs argue that FDOT failed to demonstrate past experience with similar actions, failed to demonstrate no significant floodplain impacts, failed to perform a location hydraulic study, failed to demonstrate no significant impact on cultural and historic resources, and failed to demonstrate no significant impact on noise levels. In its Motion for Summary Judgment and response to Plaintiffs' motion, FDOT disputes that contention, arguing that it sufficiently documented its evaluation of the criteria under 23 C.F.R. § 771.117(a) and otherwise satisfied the requirements of the APA.

Notwithstanding Plaintiffs' arguments to the contrary, FDOT properly considered the criteria under 23 C.F.R. § 771.117 and provided ample

documentation in support of its conclusion that a CE applied.  As discussed in greater detail below, FDOT comprehensively considered the relevant factors under 23 C.F.R. § 771.117 and provided a rational connection between the facts and the choice it made.  *See Fla. Keys Citizens Coal., Inc.*, 374 F. Supp. 2d at 1126 (citing *Baltimore Gas & Elec. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)).  The Administrative Record provides ample support for FDOT's analysis and determination that a CE applied.  As FDOT is deemed to act in the place of FHWA under the MOU, FDOT's findings are accorded great deference.

### i.    Past Experience

First, Plaintiffs present a cursory argument that FDOT erred by failing to include a record of any "past experience with similar actions that do not have significant environmental impacts under the requirements imposed by 23 C.F.R. § 771.117(a)" (Doc. 86, at 13).  Plaintiffs cite no authority for such requirements outside of the language of the regulation.  Although the regulation references "past experience with similar actions," nothing in the regulation, NEPA, or otherwise requires FDOT to document or include past experience with unrelated projects in the Administrative Record.  Instead, as FDOT argues, the reference in the regulation pertains to FHWA's basis for promulgating the CEs in subsections (c) and (d) of the regulation rather than any affirmative obligation to document past experience from unrelated projects when discussing new projects.

Under the applicable version of 40 C.F.R. § 1507.3, agencies must identify specific criteria for and identification of typical classes of action which (1) normally

require an EIS; (2) normally do not require either an EIS or EA; and (3) normally require an EA but not an EIS.  40 C.F.R. § 1507.3(b)(2)(i)-(iii).  Pursuant to that authority, FHWA designated certain actions as CEs that do not require either an EIS or EA based on its prior experience with actions not typically presenting significant impacts on the environment.  *See* 23 C.F.R. § 771.117(c) & (d).  Indeed, "NEPA calls on agencies to designate certain categories of actions as CEs if experience has shown that such actions normally do not have significant impact on the environment and they identify no 'extraordinary circumstances.'"  *Austin v. Ala. Dep't of Transp.*, Case No. 2:15-cv-01777-JEO, 2016 WL 6699307, at *2 (N.D. Ala. Nov. 17, 2016) (citing 40 C.F.R. §§ 1507.3(b)(2)(ii) & 1508.4) (internal quotation marks omitted).

Pursuant to the MOU, FDOT assumed the role and responsibilities of USDOT and FHWA under NEPA for the Cortez Bridge Replacement Project, including the authority to determine whether a CE applied to the 65-foot High-Level Fixed-Bridge Alternative (AR 607-28).  On that authority, FDOT determined that the 65-foot High-Level Fixed-Bridge Alternative qualified as a CE, meeting the definition contained in 40 C.F.R. § 1508.4 and, "based on past experience with similar actions" and the analysis set forth in the Administrative Record, did not involve significant environmental impacts (AR 11).  In making that determination, FDOT thoroughly analyzed and discussed each of the factors outlined in 23 C.F.R. § 771.117(a), as discussed more fully below.  Accordingly, FDOT did not err in failing to include reference to or evidence of past experience in the Administrative

35

Record, as the record demonstrates that FDOT properly considered the factors set forth in 23 C.F.R. § 771.117(a) and appropriately determined that the 65-foot High-Level Fixed-Bridge Alternative qualified as a CE.

### ii.    Impacts to Floodplain, Location Hydraulic Study, and Only Practicable Alternative

Turning to the factors for consideration under 23 C.F.R. § 771.117(a), Plaintiffs argue that FDOT failed to demonstrate that the 65-foot High-Level Fixed-Bridge Alternative does not have a significant impact on a floodplain and additionally failed to properly conduct a location hydraulic study and to include an "only practicable alternative."   To ensure the 65-foot High-Level Fixed-Bridge Alternative complied with local floodway and floodplain management programs, FDOT conducted floodplain coordination with the FDOT District 1 Sarasota Operations Center, the Manatee County FEMA Coordinator, the City of Bradenton Beach Coordinator, and SWFWMD (AR 42, 6138-6139, 6158-6166).   Since portions of the 65-foot High-Level Fixed-Bridge Alternative are located within the floodplain, FDOT produced a "Location Hydraulics Report" (AR 42, 6129-66). Under 23 C.F.R. § 650.111, location hydraulic studies shall include evaluation and discussion of the practicability of alternatives to any longitudinal encroachments and should include discussion of the risks associated with implementation of the action, the impacts on natural and beneficial floodplain values, the support of probable incompatible floodplain development, the measures to minimize floodplain impacts associated with the action, and the measures to restore and preserve the natural and beneficial floodplain values impacted by the action.  23

C.F.R. § 650.111(b) & (c)(1)-(5). The Location Hydraulics Report sufficiently addressed these issues.

For example, while portions of the Cortez Bridge Replacement Project fall within the floodplain, FDOT determined that the actual floodplain encroachments would be minimal due to the 65-foot High-Level Fixed-Bridge Alternative following approximately the same alignment as the existing Cortez Bridge within the coastal floodplain (AR 42, 6135). Although a minor impact to the floodplain will occur, FDOT concluded that flood elevations and risks will not be increased due to the changes in the vertical and horizontal alignments of the 65-foot High-Level Fixed-Bridge Alternative (AR 42). Further, the 65-foot High-Level Fixed-Bridge Alternative will not encourage floodplain development due to FEMA floodplain and SWFWMD regulations (AR 6140). Regarding drainage, FDOT will design the drainage consistent with FEMA, FDOT, and SWFWMD design guidelines to prevent significant changes in the base flood elevations (AR 42). The proposed drainage systems will perform hydraulically in a manner equal to or greater than the existing conveyance systems at the Cortez Bridge, and FDOT does not expect backwater surface elevations to increase (AR 42-43). In addition, the existing drains encroaching the floodplains will not need to be extended (AR 6135).

Since the project will cause minimal impact on the existing floodplains within and adjacent to the roadway improvement portion of the project, FDOT concluded that no significant adverse impacts on the natural and beneficial floodplain values will occur (AR 43). Additionally, there will be no significant change in flood risk

and in the potential for interruption or termination of emergency service or emergency evacuation routes (AR 43).  As noted, in reaching its conclusions, FDOT coordinated with the FDOT District 1 Sarasota Operations Center, the Manatee County FEMA Coordinator, the City of Bradenton Beach FEMA Coordinator, and SWFWMD (AR 6138-39).  Accordingly, the PD&E Study and FDOT's inter-agency coordination and collaboration showed that the encroachment would have no significant impact on the floodplains (AR 43, 6140).

Despite the detailed information and findings contained in the Location Hydraulics Report, Plaintiffs argue that FDOT failed to perform a study consistent with the requirements of 23 C.F.R. § 650.111 and, further, that FDOT was required to show that the preferred alternative constituted the only practicable alternative.  Plaintiffs' arguments lack merit, however.  First, the Location Hydraulics Report addresses the criteria identified in 23 C.F.R. § 650.111, providing a detailed analysis regarding the potential floodplain impacts, including floodplains, floodways, stormwater management facilities, drainage patterns, and coastal bridge design considerations, along with a discussion regarding its coordination with the FDOT District 1 Sarasota Operations Center, the Manatee County FEMA Coordinator, the City of Bradenton Beach FEMA Coordinator, and SWFWMD (AR 6129-6166).  Second, under 23 C.F.R. § 650.113, a proposed agency action which includes a *significant floodplain encroachment* shall not be approved unless FHWA, or FDOT in this instance, finds that the proposed significant encroachment is the only practicable alternative.  23 C.F.R. § 650.113(a) (emphasis added).  As indicated,

FDOT determined that the minimal encroachment would have no significant impact on the floodplain (AR 43). Consequently, FDOT did not need to demonstrate that the 65-foot High-Level Fixed-Bridge Alternative constituted the only practicable alternative.

### iii. Impacts to Water Quality and Conditions

Relatedly, as to the impact on water quality and conditions, the PD&E Study revealed that the 65-foot High-Level Fixed-Bridge Alternative would in fact enhance water quality (AR 40). The 65-foot High-Level Fixed-Bridge Alternative would collect and convey stormwater runoff to stormwater facilities by curb, gutter, and pipes to offsite ponds (AR 40, 7306-7406). The proposed stormwater facilities design will include, at a minimum, the quantity requirements for water quality impacts required by the SWFWMD and would be designed to meet state water quality and quantity requirements, with best management practices used during construction (AR 40, 7306-7308). For those reasons, FDOT concluded that the 65-foot High-Level Fixed-Bridge Alternative would enhance water quality over the current conditions.

As to the wetlands and other surface waters, the PD&E Study determined that minor, unavoidable impact would occur to portions of wetlands and other surface waters (AR 39). All practicable measures to minimize impacts to the wetlands were included, as no practicable alternative to the proposed construction in the wetlands existed, and no significant impacts to the wetlands were anticipated. Likewise, no significant impacts were anticipated to aquatic preserves or

Outstanding Florida Waters, which receive an extra measure of protection and are subject to greater stormwater runoff treatment volume requirements than surface waters (AR 40).  The record thus supports FDOT's finding of no significant impact as to water quality and conditions.

### iv.    Impacts to Cultural or Historical Resources

Next, Plaintiffs argue that FDOT failed to demonstrate that the 65-foot High-Level Fixed-Bridge Alternative does not have a significant impact upon cultural and historical resources and thus failed to satisfy this factor for application of a CE.  As Plaintiffs indicate, the Cortez Village Manatee County Historical and Archaeological Overlay District and the City of Bradenton Beach Old Town Overlay District fall within the Area of Potential Effect ("APE") (AR 6222).  Manatee County originally established the Cortez Village overlay district "in an effort to preserve and protect its special character; promote its heritage; provide historical continuity; protect/improve property values; and promote local pride" (AR 6222).  The Cortez Historic District was listed in the National Register of Historic Places ("NRHP") in March 1995 in the context of exploration and settlement, commerce, architecture, and maritime history (AR 6227).  As FDOT noted, a "reconnaissance of the district evidenced that much of its historic fabric remains intact" (AR 6227).  Indeed, the historic fishing village has retained much of its historic residential and commercial structures, making it a viable resource to the area and a destination for both tourists and locals to enjoy (AR 6218).

Given the nature and character of the Cortez Historic District, some residents and local leaders expressed concern regarding the 65-foot High-Level Fixed-Bridge Alternative and its effects on the cultural and historical aspects of the Village of Cortez. Along those lines, Plaintiffs point mainly to citizen commentary and vocal opposition by community members and leaders regarding the 65-foot High-Level Fixed-Bridge Alternative ruining the unique ambiance and character of the Village of Cortez as the basis for finding that FDOT did not appropriately consider the cultural and historical factors under 23 C.F.R. § 771.117(a) (*see, e.g.,* AR 558, 569, 587, 1397, 1403, 1408, 1414-1415, 1463, 1474, 1488, 2179, 2184, 2194, 2195-2196, 6638). Following the August 31, 2017 public hearing, responses regarding the preferences for one of the alternatives indicated that 50% favored the No-Build (Repair) Alternative and 38% favored bridge replacement (AR 30). Of the responses favoring replacement, 75% favored the 65-foot High-Level Fixed-Bridge Alternative as opposed to 24% favoring the 35-foot Mid-Level Drawbridge Alternative (AR 30). The comments received by FDOT generally ranged from opposition to bridge replacement due to the potential for impacts to the community and the environment to full support of the project and its potential benefit to the community, the traveling public, and tourism (AR 30). FDOT acknowledged that, among the local communities, the community of the Village of Cortez generally voiced support for repair or rehabilitation over bridge replacement (AR 31).

As FDOT points out, however, opposition to the 65-foot High-Level Fixed-Bridge Alternative does not equate to a finding that the proposed alternative creates

a significant cultural or historical impact for purposes of 23 C.F.R. § 771.117(a). Nor does such opposition render the 65-foot High-Level Fixed-Bridge Alternative "highly controversial."   In determining whether a project will pose a significant impact, consideration must be given to the degree to which the effects on the quality of the human environment are likely to be highly controversial.  *Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1338 (N.D. Ga. 2003) (citing 40 C.F.R. § 1508.27(b)(4)).  The highly controversial significance factor gets triggered when a substantial dispute about the size, nature, or effect of a federal action exists, not merely the existence of opposition to a use.  *Nat. Res. Def. Council v Nat'l Park Servs.*, 250 F. Supp. 3d 1260, 1297 (M.D. Fla. 2017).  To establish that an action is highly controversial, a plaintiff should present scientific or other evidence that shows flaws in the methods or data relied upon by the agency in reaching its conclusion, which still may not raise the issue to the level of highly controversial. *See id.*  If the plaintiff demonstrates that a substantial dispute exists concerning the size, nature, or effect of the proposed action, the agency must then consider the dispute and address the concerns in the final decision. *Ga. River Network*, 334 F. Supp. 2d at 1338.

Here, the FDOT held public hearings and received comments from the public before, during, and after the hearings.  The comments reflected support for and opposition to the 65-foot High-Level Fixed-Bridge Alternative (*see* AR 639-3525, 6638).  Notwithstanding Plaintiffs' opposition, FDOT indicated that, of the bridge replacement alternatives, the 65-foot High-Level Fixed-Bridge Alternative

"garnered the most support overall throughout the study, most likely due to the reduced delay and lowest cost" (AR 6638).   As a result, Plaintiffs cannot demonstrate that the 65-foot High-Level Fixed-Bridge Alternative presents a substantial dispute nor that it can be considered a highly controversial action. Regardless, FDOT noted that it took into consideration all comments received, which necessarily included the opposition from Plaintiffs and other residents and local leaders (AR 30, 6638).  Having determined that the 65-foot High-Level Fixed-Bridge Alternative obtained the most support, FDOT properly proceeded with that alternative.

Beyond that, FDOT conducted a "Section 106 Effects Determination Case Study Report" in 2015 and a "Cultural Resource Assessment" in 2014, with an update to the Cultural Resource Assessment in 2017, to address impacts to cultural and historical resources (AR 6181-6617, 6618-6733, 6734-6790).  Overall, FDOT concluded that the 65-foot High-Level Fixed-Bridge Alternative was expected to have no significant impact on any cultural resources or historic sites and districts (AR 36-38).  In reaching that conclusion, FDOT provided these written reports to FWHA and the Florida State Historic Preservation Office ("SHPO") for review, after which both FHWA and SHPO concurred with FDOT's conclusion that no significant impact would occur to historic sites or districts (AR 37-38, 88-97).

In addressing potential cultural and historical impacts, FDOT identified 61 resources within the APE for the 65-foot High-Level Fixed-Bridge Alternative (AR 36-38, 6182).  Of those, only six resources, all within the historic district at the east

43

end of the project APE and south of SR 684, were considered significant: the previously recorded Cortez Historic District, listed on the NRHP, and five NRHP-eligible contributing buildings (AR 37, 6222-6223). The Section 106 Effects Determination Case Study Report showed that the 65-foot High-Level Fixed-Bridge Alternative would not require any ROW from the Cortez Historic District and would not require changes to the existing roadway adjacent to the historic district (AR 37, 6618-6733). Further, regarding the effects upon the Cortez Historic District, FDOT found:

> Only two blocks of the historic district are adjacent to SR 684 (Cortez Road). The eastern touchdown for the [65-foot High-Level Fixed-Bridge Alternative] would be approximately one block away (approximately 250 feet to the west) and the eastern end of the bridge would be approximately 750 feet away from the historic district. The proposed bridge includes sidewalks on both sides that will transition to the existing sidewalks along the at-grade SR 684 (Cortez Road) roadway. The new bridge will replace an existing bridge, so it will not introduce a new element that was not historically present when the historic district was listed in the NRHP, but it will modify the appearance of the element, specifically the type and height of the bridge. The existing and proposed bridge are not visible from the historic district, except at the northern edge along SR 684 (Cortez Road). Most of the historic district is surrounded by vegetation, homes, or other development. Based on a rendering of the proposed new bridge, and limited views of the bridge from the historic district, the proposed 65-foot High-Level Fixed-Bridge would not result in significant visual and aesthetic changes to the historic district. The historic district is significant for its association with the historic fishing industry in Florida, commerce and maritime history, and the vernacular architecture associated with the maritime character of the village. Since the proposed new bridge is not adjacent to the historic district and is not readily visible from the district, this change would not alter the characteristics that make this historic district significant. At the five residences within the APE that are contributing resources, the predicted noise levels are below the noise abatement criterion (NAC) of 66 dBA and only expected to increase by 2.2 dBA or less at the locations, which is not a perceptible increase. The [65-foot High-

> Level Fixed-Bridge Alternative] will not alter the existing automobile access to the historic district nor will it impact the use of individual contributing resources within the historic district.

(AR 37-38, 6628-6632, 6645-6647).  Moreover, rather than divide the Village of Cortez or disrupt community cohesion, the 65-foot High-Level Fixed-Bridge Alternative will bring together the areas north and south through improved roadways, sidewalks, bicycle lanes, and walkable public space (AR 32, 3538, 3541, 3547, 3550; Doc. 10).  Based on the foregoing, FDOT appropriately considered the impacts upon the cultural and historical resources and correctly determined that no significant impact would occur.

### v.   Impacts to Noise

Plaintiffs also contend that significant impacts from traffic noise will occur with the 65-foot High-Level Fixed-Bridge Alternative and that FDOT failed to present information to the public regarding potential noise walls that could be required for mitigation, which may exceed 20 feet and cause visual impacts. Consequently, they argue that FDOT failed to satisfy the prerequisite of demonstrating that the 65-foot High-Level Fixed-Bridge Alternative would not have a significant impact on noise levels.  As part of the PD&E Study, however, FDOT commissioned a "Noise Study Report" to obtain information regarding any significant impacts of traffic noise attributable to the alternatives presented for the Cortez Bridge Replacement Project (AR 6051-6128).  The study concluded that some noise impact would occur, but, based on the traffic noise analysis, the consideration of noise barriers to mitigate traffic noise impacts, and the

implementation of minimization measures per standard specifications, FDOT determined that the 65-foot High-Level Fixed-Bridge Alternative was expected to have no significant impact on potential noise sensitive sites (AR 47-49, 6051-6128).

The Noise Study Report indicated that that the 65-foot High-Level Fixed-Bridge Alternative was predicted to result in exterior traffic noise levels ranging from 50.2 dB(A) to 72.7 dB(A) at 134 noise-sensitive sites located adjacent to the project corridor (AR 47).  Of those 134 sites, 41 residences, including designated RV sites, were predicted to experience future traffic noise levels approaching or exceeding 66 dB(A), but none of the evaluated sites would experience a substantial increase of traffic noise because of the 65-foot High-Level Fixed-Bridge Alternative (AR 47, 6092-6100).  Compared to existing conditions, traffic noise levels for the 65-foot High-Level Fixed-Bridge Alternative conditions were predicted to increase only 4.2 dB(A) or less at noise-sensitive sites, meaning that traffic noise levels were not expected to substantially increase above existing conditions as a direct result of the 65-foot High-Level Fixed-Bridge Alternative (AR 6101).  Indeed, a substantial noise increase involves an increase in noise levels of 5 to 15 dB(A) in the design year over the existing noise level.  23 C.F.R. § 772.5.  Since FDOT anticipated noise levels would not increase more than 4.2 dB(A), the finding of no significant impact was warranted.

Given the potential increase in noise levels, however, FDOT evaluated noise-abatement measures, including noise barriers, for the 41 noise-sensitive sites (AR 48, 6101-6103).  While the effectiveness of the barrier reduction provided with each

barrier system varied between locations depending on the physical location and proximity of the impacted noise-sensitive sites to the breaks in the barrier, the results of the analysis showed that the proposed noise barriers could potentially provide at least the minimum required noise reduction for a reasonable cost (AR 48). Several abatement measures were evaluated for all the noise-sensitive sites impacted by the 65-foot High-Level Fixed-Bridge Alternative, with traffic system management techniques, alignment modifications, and property acquisition all ruled out as reasonable abatement measures (AR 48). Land use controls were identified as feasible and reasonable for use by local officials in future land use planning (AR 48). In fact, FDOT indicated that it would perform a land use review during the project's design phase to identify all noise-sensitive sites that may have received a building permit subsequent to the noise study but prior to the project's date of public knowledge, or September 18, 2019, the date on which FDOT approved the CE (AR 12, 49). If such review identifies noise-sensitive sites permitted prior to the date of public knowledge, those sites will be evaluated for traffic noise impacts and abatement considerations (AR 49). As FDOT indicated, it is committed to further consideration of noise barrier systems during the project's final design phase at three of the impacted sites contingent upon (1) detailed noise analyses during the final design process supporting the need for and the feasibility and reasonableness of providing abatement; (2) cost analysis indicating that the cost of the noise barriers will not exceed the cost reasonable criterion; (3) review and resolution of safety and engineering aspects, as related to the roadway user and the adjacent property owner;

and (4) community input supporting types, heights, and locations of the noise barriers provided to the district office, which would allow Plaintiffs and other interested parties to present their suggestions regarding any potential noise barriers (AR 48).

FDOT recognized that, based on the existing land use within the limits of the project, construction of the proposed roadway improvements might result in a temporary noise or vibration impact (AR 49, 6104).  FDOT anticipates that the application of the FDOT Standard Specifications for Road and Bridge Construction will minimize or eliminate most of the potential construction noise and vibration impacts (AR 49).  To the extent it does not, and if unanticipated noise or vibration issues arise during the construction process, the Project Manager, in conjunction with the District Noise Specialist and the Contractor, will investigate additional methods for controlling the impacts (AR 49, 6104).

Though Plaintiffs contend that FDOT failed to present to the public the issue of the use of noise walls as sound barriers, FDOT allowed commentary before, during, and after the August 31, 2017 hearing held regarding the Cortez Bridge Replacement Project (AR 321-606, 6105).  FDOT received a total of 147 comments regarding the project (AR 6105).  Of those, only five specifically mentioned noise (AR 6105).  Notwithstanding, FDOT will continue to consider noise barrier systems and accept public input on the types, heights, and locations of such barriers during the project's final design phase.   Given the Noise Study Report results and

considering FDOT's continued efforts to find amenable noise abatement and mitigation measures, FDOT appropriately found no significant impact to noise.

### vi.   Impacts to Community Aesthetics and Cohesion

Plaintiffs also assert that the 65-foot High-Level Fixed-Bridge Alternative would ruin community aesthetics and cohesion of the Village of Cortez, along with its surrounding areas and sub-communities.  Regarding the aesthetic effects, FDOT concluded that 65-foot High-Level Fixed-Bridge Alternative would have no significant impacts (AR 35).  For example, SR 789 from the Longboat Key Bridge to 5th Avenue in Holmes Beach is designated as the Bradenton Scenic Highway, and the 65-foot High-Level Fixed-Bridge Alternative will have no impact on the elements considered for the scenic highway designation within the limits of the project (AR 35).  Notably, since the Cortez Bridge is readily visible by boat traffic and from adjacent residential areas, FDOT will consider specific aesthetic and landscaping needs during the final design phase of the project and will establish and work closely with a Bridge Design Committee during the design phase to advise FDOT on aesthetic design features for the bridge and approaches (AR 35, 56).  Local agencies and the community will determine membership on the Bridge Design Committee (AR 35).

As to community cohesion, the PD&E Study indicated that the 65-foot High-Level Fixed-Bridge Alternative would require only a limited amount of ROW acquisition along the project corridor, affecting some residential and/or commercial properties (AR 32).  Regardless, the improvement of the existing facility with

limited ROW acquisition was not expected to result in significant changes to community cohesion, as no potential existed for isolating neighborhoods (AR 32, 71-74).  Moreover, the 65-foot High-Level Fixed-Bridge Alternative, as conceived, would not displace any residences or businesses within the community (AR 35-36).  Rather, the project should enhance transportation options for local residents with the addition of bicycle lanes and sidewalks or shared-use paths throughout the corridor and provide opportunities for greater community cohesion and walkability (AR 32).  The 65-foot High-Level Fixed-Bridge Alternative would connect the north and south sides of the Village of Cortez community with a roadway, sidewalks, and walkable space under the new bridge at 127th Street West (AR 32, 3538, 3541-3542, 3545, 3547; AR Doc. 10).  The 65-foot High-Level Fixed-Bridge Alternative is also high enough to create an open space along the waterfront under the Cortez approach and bridge that could support a variety of public uses and amenities implemented at the discretion of local agencies (AR 32, 3550).   Given the comprehensive public outreach program and the minimal effects to social resources, the 65-foot High-Level Fixed-Bridge Alternative was expected to have no significant impact on the social aspects of the community (AR 32).   The record therefore supports FDOT's finding of no significant impact to community aesthetics and cohesion.

### vii.   Impacts to Mobility, Traffic, Pedestrian and Bicycle Facilities, and Navigation

Though Plaintiffs do not highlight the issue, the PD&E Study indicated that the 65-foot High-Level Fixed-Bridge Alternative will enhance all transportation

options (AR 22, 33-35, 54-55, 141, 154-158, 210, 5083-5392, 5393-5401, 6031-6033), one of the considerations under 23 C.F.R. § 771.117(a).  The 65-foot High-Level Fixed-Bridge Alternative is anticipated to enhance the overall movement and circulation within and between the mainland and Bradenton Beach for businesses and residents (AR 33-34, 5083-5392).  For instance, delays caused by the opening and closing of the drawbridge would be removed for both vehicles and vessels (AR 34, 154-156, 210).  Vehicle travel time would also be reduced to 2.38 minutes (compared to 4.5 minutes for the No-Build Alternative) (AR 34).  Importantly, improved travel time for emergency services to and from the mainland and Anna Maria Island are anticipated because the traffic would not need to stop periodically for the drawbridge to open (AR 34).  The addition of 10-foot shoulders would also allow vehicles to pull out of the traffic lanes, allowing emergency vehicles to ingress and egress down the center of the roadway, which emergency vehicles cannot currently do on the existing Cortez Bridge (AR 34).  Additionally, the 65-foot High-Level Fixed-Bridge Alternative would assist with facilitating an unimpeded route during emergency evacuations, including during hurricane season (AR 34).  As to the bus and trolley routes, the 65-foot High-Level Fixed-Bridge Alternative will have no impact (AR 34).

The 65-foot High-Level Fixed-Bridge Alternative is also expected to enhance bicycle and pedestrian facilities (AR 54, 141, 5393-5401).  Unlike the current Cortez Bridge, which has only 5- to 6-foot sidewalks and no bicycle lanes, the inclusion of the 10-foot shoulders and 10-foot sidewalks with sidewalks and bicycle lanes on the

roadway approaches to on the 65-foot High-Level Fixed-Bridge Alternative provides safer and improved facilities for pedestrians and bicyclists crossing the bridge (AR 22, 34, 54, 141, 5393-5401).   Acknowledging some of the mobility concerns expressed by Plaintiffs, the 65-foot High-Level Fixed-Bridge Alternative will provide sidewalk facilities designed and constructed to comply with the ADA, including meeting the requirements for access, width, and grade (AR 54).

FDOT also considered navigation issues for vessels traveling by water.   In fact, McClash expressed that he would suffer personal harm due to an inability to navigate both his boat with a mast height of more than 60 feet and other boats with a mast height exceeding 65 feet under the 65-foot High-Level Fixed-Bridge Alternative (McClash Aff., ¶3).   To address similar concerns, FDOT conducted a "Boat Height Survey" (AR 6028-6050).   A marina survey yielded the following results:

> The general consensus among interviewed marina managers, dockmasters, and vessel owners was that boats taller than 65 feet avoid the Gulf Intracoastal Waterway (GICW) due to the shallow nature of the GICW and depths required for large keels.  Vessel operators do not have an expectation that the GICW is a place to navigate tall sailboats. If boats taller than 65 feet need repair or mooring, they use facilities in Tampa Bay, the Manatee River (both of which are north of the Manatee Bridge) or they enter the GICW at Longboat Pass and use facilities south of the Cortez Bridge.

(AR 6031).   An on-water survey indicated that the tallest vessel observed moored between the Cortez Bridge and the Manatee Bridge during the survey had a total height of approximately 63 feet above the waterline, with all other vessels observed between the bridges showing an overall height below 60 feet (AR 6031-6033).   In

speaking with some vessel owners, one owner of a sailboat with a mast height of 63 feet indicated that he, and possibly others, would find an alternative docking facility, as the resulting clearance would appear too close for comfort, and one owner who stated that the and other owners of vessels in a nearby marina support the 65-foot High-Level Fixed-Bridge Alternative, as they all own vessels with mast height well below 65 feet and thus could easily pass beneath a structure with a 65-foot vertical clearance (AR 6031-6032).

Further, the USCG explicitly indicated that, to provide for the reasonable needs of navigation, a vertical clearance of at least 65 feet was required for a fixed-bridge structure (AR 55). At that height, with a guide clearance of 90 feet perpendicular distance between fenders, the 65-foot High-Level Fixed-Bridge Alternative would provide access to approximately 98% of the boats currently requiring the existing bridge to open to safely navigate would (AR 55). As indicated, the remaining 2% of boats taller than 65 feet typically moor at other facilities north of the Cortez Bridge, near the mouth of the Manatee River or Tampa Bay, and can use the Gulf of Mexico to travel south (AR 55). Accordingly, as to the factor considering travel patterns, FDOT properly demonstrated that no significant negative impact would occur but rather that travel patterns would almost invariably be enhanced.

### viii.   Impacts to Air Quality

In addition, FDOT found that the 65-foot High-Level Fixed-Bridge Alternative would not significantly impact air quality (AR 49). In the short term,

construction-phase air quality would be impacted by emissions from diesel-powered construction equipment and dust from construction activities, but the creation of airborne particles would be effectively controlled by watering or the application of other controlled materials in accordance with FDOT's Standard Specifications for Road and Bridge Construction (AR 49).  No adverse impact would occur in the long term because the project would reduce delay and congestion on all facilities within the project area (AR 49).  Plaintiffs do not dispute that FDOT demonstrated no significant impact upon air quality, and the record supports FDOT's finding in that regard.

### ix.  Impacts to Land Use

Finally, the PD&E Study also addressed potential impacts to land use designations in the City of Bradenton Beach and the Village of Cortez (AR 33), another one of the factors to consider under 23 C.F.R. § 771.117(a).  The proposed replacement of the Cortez Bridge and the improvements to the roadway approaches were deemed compatible with the current and future land use plans and consistent with the City of Bradenton Beach's 2020 Comprehensive Plan, Manatee County's Comprehensive Plan (through Supplement #21), and the Sarasota Manatee Metropolitan Planning Organization's 2040 Strategic Mobility Plan and Financially Feasible Plan (AR 33).  Accordingly, the 65-foot High-Level Fixed-Bridge Alternative was expected to present no significant impact on any land use plans or designations.  Plaintiffs make no issue of FDOT's land use findings, and none appear in the record.

## C.    Arbitrary or Capricious

Given its findings in the PD&E Study, FDOT correctly determined that the 65-foot High-Level Fixed-Bridge Alternative qualified for a CE.  As the foregoing illustrates, therefore, FDOT's decision to proceed with the Cortez Bridge Replacement Project without issuing an EIS or EA was not arbitrary or capricious. FDOT deliberately discussed, analyzed, studied, and considered all the relevant criteria in determining that a CE applied and in deciding to replace the current drawbridge with the 65-foot High-Level Fixed-Bridge Alternative.  While some community members, including Plaintiffs, expressed opposition to adoption of the 65-foot High-Level Fixed-Bridge Alternative, such opposition does not render FDOT's decision arbitrary or capricious.  Rather, as the Administrative Record makes clear, FDOT expended great time and effort, including inter-agency collaboration, review of years' worth of bridge inspection reports, public hearings, and conducting an engineering analysis and environmental studies, in determining whether the 65-foot High-Level Fixed-Bridge Alternative would pose any significant impacts on planned growth or land use; any natural, cultural, recreational, or historic resources; air, noise, or water quality; travel patterns; or environmental resources and would not require the relocation of significant numbers of people.  The decision resulted from a thorough, well-reasoned analysis of such information, which FDOT appropriately documented throughout the Administrative Record.  Given this Administrative Record, and providing the

deference afforded agencies under the APA, FDOT's final agency action cannot be considered arbitrary or capricious.

### D.   Census Block Data

Lastly, FDOT argues that Plaintiffs failed to state a plausible claim for relief that FDOT erred and violated NEPA by using U.S. census block data to determine demographic impacts.   Namely, in paragraph 54 of the Second Amended Complaint, Plaintiffs allege the following:

> FDOT failed to define the low income and senior population within the area of impact and instead used a broader area known as a census block, which does not accurately define those citizens impacted specifically within the project area.

(Doc. 84, ¶54).   Notwithstanding the single allegation in the Second Amended Complaint, Plaintiffs do not otherwise address the issue in their Motion for Summary Judgment, reply, or supplement (*see* Docs. 84, 86, 96, 100).   Given the failure to make any arguments or cite any authorities addressing the use of the census block data in any of the pertinent filings, Plaintiffs have waived the issue. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012) (collecting cases and noting that "[a] passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it").

### IV.   Conclusion

For the foregoing reasons, it is hereby

ORDERED:

1.     Plaintiffs' Motion for Summary Judgment (Doc. 86) is DENIED.

2.      Defendants' Motion for Summary Judgment (Doc. 92) is GRANTED.

3.      The Clerk is directed to enter judgment in favor of Defendants and against Plaintiffs.  Thereafter, the Clerk is directed to terminate any deadlines and close the case.

DONE AND ORDERED in Tampa, Florida, on this 5th day of August, 2022.

ANTHONY E. PORCELLI
United States Magistrate Judge

cc:     Counsel of Record